# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### May 6, 2014 Session

## BILLY McILLWAIN v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Gibson County**
**No. 17837   Clayburn Peeples, Judge**

---

**No. W2013-02306-CCA-R3-PC  - Filed July 7, 2014**

---

The Petitioner, Billy McIllwain, appeals the Gibson County Circuit Court's denial of his petition for post-conviction relief from his 2009 convictions for first degree murder, two counts of aggravated assault, and possession of a deadly weapon with the intent to employ it in the commission of the offense and his effective sentence of life plus six years. The Petitioner contends that the trial court erred by denying him relief because he received the ineffective assistance of counsel. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Brandon L. Newman (on appeal) and Jennifer Deen (at post-conviction hearing), Trenton, Tennessee, for the appellant, Billy McIllwain.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Garry Brown, District Attorney General; and Larry Hardister and Stephanie Hale, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case arises from the Petitioner's shooting and killing Jodie Alford, the mother of his child. The Petitioner appealed his convictions, and this court affirmed the convictions and summarized the facts of the case as follows:

> During the June 3[, 2007] shooting incident, the Defendant also pointed his weapon at Celia Kilburn and Mike Harris. Based on these actions, a Gibson County grand jury returned a four-count indictment against the

Defendant, charging him with one count of first degree murder, two counts of aggravated assault, and one count of possession of a deadly weapon with the intent to employ it in the commission of an offense.

The Defendant and the victim had a tumultuous romantic relationship and were involved in an ongoing custody battle. After an argument on the morning of June 3, 2007, the victim left the Defendant's residence in Jackson with the child. She went to her father's house in Dyer.

Brandon Browning testified that he had known the Defendant for about ten years. He kept a black book bag for the Defendant, containing the Defendant's guns, because the Defendant, as a convicted felon, was not allowed to have them in his possession. On the morning of June 3, around 11:15 a.m., the Defendant called Mr. Browning requesting his bag. According to Mr. Browning, the Defendant sounded normal. Mr. Browning left the bag outside for the Defendant, which the Defendant picked up on his way to Dyer.

Celia Kilburn, the victim's aunt, testified that she lived at 246 Linden Street in Dyer and that her brother, Tommy Alford, also lived on Linden Street. Tommy Alford was the victim's father. On the morning of June 3, 2007, the victim and her son were staying with her father on Linden Street. When Mrs. Kilburn returned home that morning from church, she spoke with the victim by telephone, ate lunch, and then walked to her brother's house about 12:45 p.m. Mrs. Kilburn saw the Defendant's truck parked in the yard as she walked toward the house. After stepping onto the porch, she heard a "loud racket" coming from inside the house, so she opened the front door. Mrs. Kilburn was met by the Defendant, who pointed a handgun at her. The Defendant then turned and fired at the victim, who was sitting on the floor up against the couch. Mrs. Kilburn ran from the house screaming, alerting the neighbors, including Mike Harris. According to Mrs. Kilburn, when the Defendant pointed the gun at her, she froze and was "waiting to die."

Mike Harris, a paramedic, testified that he lived near Tommy Alford's house. On June 3, 2007, he was sitting on his front porch, when he heard a "loud bang" and then someone screaming. He went to investigate and saw Mrs. Kilburn running down the street toward her house. He asked Mrs. Kilburn what was wrong, and she stated that "he shot her" and pointed toward Tommy Alford's house. Mr. Harris started toward the residence and, just before he got to the driveway, he saw the Defendant exit the house. When the Defendant saw Mr. Harris, he pointed the handgun at Mr. Harris, who

immediately stopped and started "backing up." The Defendant then lowered his gun, got into his truck, and drove away. According to Mr. Harris, the Defendant was very "casual" as he left the house. Mr. Harris felt "threatened" when the Defendant pointed the gun at him, and he worried for the safety of his nearby wife and child.

After the Defendant left, Mr. Harris went inside the house and started rendering first aid to the victim, who was lying on the floor with a gunshot wound to her chest. According to Mr. Harris, the victim was still making voice responses when he entered. Prior to emergency personnel arriving on the scene, the victim lost consciousness, and Mr. Harris attempted CPR. Mr. Harris did not observe "any signs of life" as the victim was loaded onto the ambulance.

Officer Ryan Shanklin, at the time of the shooting employed with the Kenton Police Department, was informed about the shooting and given a description of the Defendant's truck. While patrolling, Officer Shanklin saw a vehicle matching the description. The vehicle was parked in a driveway, and the driver, later identified as the Defendant, was waving his arm out of the driver's side window to get Officer's Shanklin attention. Officer Shanklin stopped, asked the Defendant to exit the vehicle, and placed him in handcuffs. According to Officer Shanklin, the Defendant, who did not appear to be intoxicated, was crying and stated, "I know I f[-----] up" and "You don't know what she's put me through with my kids." The Defendant was then turned over to Dyer City police officers. The Defendant was unarmed at the time he was detained, and no weapon was found inside the truck.

The Defendant was transferred to the Dyer City Police Department. After arriving at the station, Assistant Chief of the Dyer Police Department Brad Oliver read the Defendant his *Miranda* rights. The Defendant signed a waiver of rights form at 2:13 p.m. and, thereafter, gave a statement wherein he admitted to shooting the victim. Sergeant Rodney Wilkins also witnessed the statement, and the Defendant appeared "normal" to him, showing no signs of intoxication. Also, according to Asst. Chief Oliver, the Defendant was upset during the interview, but he did not exhibit any signs of intoxication.

A black book bag containing 9 mm rounds had been found abandoned just outside the city limits of Dyer. Forensics determined that these rounds were the same brand and caliber as the ones used to shoot the victim. The shot

that killed the victim was fired somewhere between six inches and two feet from the skin. The victim's blood was found on the Defendant's shorts. Moreover, according to the victim's mother, the Defendant had previously threatened to kill her and the victim.

The Defendant testified on his behalf claiming that he was intoxicated at the time of the shooting, that he did not intend to go to the residence to kill the victim, and that the shooting was accidental. The Defendant's mother testified about the Defendant's level of intoxication on the morning of June 3. According to her, the Defendant had been drinking and admitted to taking a "handful" of pills just prior to the shooting.

*State v. Billy Earl McIllwain, Jr.*, No. W2009-00987-CCA-R3-CD, slip op. at 1-3 (Tenn. Crim. App. Sept. 8, 2010), *perm. app. denied* (Tenn. Feb. 17, 2011).

The Petitioner filed a petition for post-conviction relief contending that he received the ineffective assistance of counsel. He alleged that counsel failed to confer properly with him, interview favorable witnesses, appear in court on his behalf at multiple hearings, investigate his case adequately regarding his intoxication at the time of the offenses, file proper pretrial motions, cross-examine the State's forensic expert, make proper objections, prepare an intoxication defense, advise him of his right against self-incrimination, request relevant jury instructions, "perfect" a motion for a new trial and an appeal, raise proper issues on appeal, and provide zealous representation.

At the post-conviction hearing, the Petitioner testified that he paid counsel $20,000 to represent him at the trial and that counsel met with him at the jail twice or three times. He said, though, that counsel failed to appear at June and September 2007 scheduled court appearances. He said counsel communicated by way of "notes" stating that he would meet with the Petitioner but failed to come to the jail. He identified a September 26, 2007 letter from counsel in which counsel admitted that he was about one week late in "notifying [the Petitioner] of something." The letter was received as an exhibit. We note at the outset that several exhibits were received at the post-conviction hearing but are not included in the appellate record.

The Petitioner testified that he filed a complaint with the Board of Professional Responsibility because counsel failed to meet with him adequately and to provide discovery and said that counsel did not provide or do everything he requested. He said that he hired counsel in June 2007 and that by November, counsel no longer communicated with him. He identified another letter in which counsel said he planned to meet with the Petitioner on Saturday, March 1, 2008, about a motion. The Petitioner said counsel did not appear for the

-4-

meeting. He identified his handwritten notes and agreed he wrote in the notes that counsel failed to appear for four appointments as of March 1, 2008, and failed to appear in court on January 4, 2008. He said counsel did not provide reasons for his absence.

The Petitioner testified that counsel had not investigated his case as of March 1, 2008, and that counsel said the State would not allow the Petitioner to have discovery material. He said that counsel only provided him "a couple of warrants and statements." He said counsel provided the defense's request for discovery. Regarding defense witnesses, he said that he asked counsel to speak with Joyce Herron, who was the Petitioner's mother, Mary Katherine Vandiver, Brandon Browning, Josh Chumney, Erica Pruitt, and Amber Browning. He said that although counsel spoke to his mother occasionally, counsel had not spoken to the other potential witnesses as of March 1, 2008, which was ten months into counsel's representation.

The Petitioner testified that he explained to counsel the sequence of events on the day of the shooting. He said he woke at 5:00 or 5:30 a.m., cared for his son, and began to cook breakfast. He said that as he cooked, the victim went through his cell phone, became angry, and began arguing and throwing things. He said that the victim told him she was leaving and that he placed his son in the car seat. He said that the victim left and that he returned to the house, began drinking whiskey, took a handful of Xanax and hydrocodone, and went for a drive. He said he went to "Trenton and this stuff happened." He said he told counsel about these events and his intoxication. He denied counsel investigated his intoxication and advised him about an intoxication defense.

The Petitioner testified that he asked counsel to obtain a copy of his recorded statement to the police, that counsel said he would obtain a copy, and that counsel failed to provide it. He denied counsel mailed him copies of statements or other evidence counsel collected during his investigation but said counsel mailed him copies of witness statements provided by the State. Regarding his police interview, he said he told counsel that he was intoxicated and did not recall much from the interview. He said that he and counsel discussed the police's performing a blood alcohol concentration test but denied that counsel investigated the test. Regarding forensic and ballistic evidence, he requested from counsel information surrounding the shooting. He said that counsel told him only one shot was fired but that evidence of two shots was presented at the trial. He said counsel told him that the State did not permit counsel to view the reports before the trial. He said that it was important that two shots were fired because one shot could indicate an accident but that two shots were not an accident. He agreed he wanted counsel to investigate a possible accidental shooting defense.

The Petitioner testified that counsel did not show him any of the photographs that were admitted at the trial. Regarding the possible defense witnesses, he said he learned

counsel only spoke to his mother and attempted to contact the victim's brother, although he did not know if counsel spoke with the victim's brother. He said counsel wanted to know if the victim's brother would admit having an argument with the Petitioner on the morning of the shooting. He said counsel told him that he was going to attempt to elicit such testimony at the trial.

The Petitioner testified that at the trial, counsel told him "it would be best" if he testified, although the Petitioner told counsel he did not want to testify when they discussed it once or twice previously. He said that he did not want to testify at the trial but that he listened to counsel because he was an attorney. He said counsel did not explain the consequences of testifying and not testifying. He did not recall discussing with counsel the facts of the case or preparing for the trial, although they discussed upcoming court dates. The Petitioner kept a log of his contact with counsel, which was received as an exhibit.

The Petitioner testified that he wrote counsel twenty to thirty letters and that counsel responded to three or four. He said that counsel last visited him at the jail one or two weeks before the trial and that the conversation was about five to ten minutes. He denied he and counsel had any other conversation about the trial in the week before the trial. He said he and counsel agreed that counsel would call the Petitioner's mother as a witness because she talked to the Petitioner on the morning of the shooting. He said he asked counsel to interview the arresting officer and the "forensic officer." He said he wanted counsel to talk to Ms. Vandiver because she had been living with him for about two months before the shooting.

The Petitioner testified that he underwent a mental health evaluation upon the State's request, that the report said he was "okay," that he asked counsel if the defense could have an expert perform an evaluation, and that counsel "left it alone" and did not discuss it again. Regarding counsel's investigation, he said that his mother asked counsel if they needed to hire an investigator and that counsel said it was unnecessary.

The Petitioner testified that he felt counsel did not do anything during the trial, that counsel made no objections, that counsel did not question anyone, and that counsel "stood there like he was asleep." He did not believe counsel made a closing argument and said counsel refused to ask the questions the Petitioner wanted asked. He identified a March 12, 2008 letter he wrote to counsel in which the Petitioner expressed concern for his case and concern counsel was not providing information or communicating with him. He stated that the letter also mentioned additional potential defense witnesses Jenny Jenkins and Jamie Alexander. He said counsel told him that he never spoke to them.

-6-

The Petitioner identified a May 15, 2008 letter from counsel in which counsel discussed the difficulty he had in obtaining discovery information and stated that Gibson County was the most difficult place to obtain discovery and that counsel would have to go to the district attorney's office to handwrite the police narratives. The Petitioner denied counsel gave him the narratives or any other document, except the warrants and witness statements. He identified a May 15, 2008 letter he wrote to counsel asking for a copy of the "trial transcripts" and a "full motion of discovery" in order for him to review the evidence and determine what was happening in his case. He said counsel responded to the letter. He said that he wrote a second letter on May 26, 2009, requesting the same information but that counsel did not respond. He said he was in prison by that time. He agreed he filed a complaint with the Board of Professional Responsibility on August 4, 2009. He said that three and one-half months after his trial, counsel returned one of the Petitioner's letters with counsel's handwritten remarks, stating that the notice of appeal had been filed and that he would forward the trial transcript to the Petitioner after it was completed.

The Petitioner testified that he wrote counsel on July 18, 2009, requesting documentation showing that an appeal had been filed because he learned the time in which an appeal could be filed was limited. He said counsel did not respond and that by July 2009, he still had not received any documents from counsel regarding the appeal. He said that counsel sent him a bill for the appellate process but that he received nothing else. He denied receiving the appellate briefs or the trial transcript. He identified an August 25, 2009 letter from counsel stating that counsel had recently received the transcript, that a copy of the transcript was enclosed, and that counsel was working on the appeal. He denied, though, the transcript was enclosed. He said he finally received the transcript from post-conviction counsel about one and one-half months before the post-conviction hearing.

The Petitioner identified a May 23, 2011 letter he wrote to counsel providing "paperwork for the appeal" and said counsel never responded. He did not recall meeting with counsel before the pretrial conference. He said counsel filed a motion to suppress his statement, which was denied. He said that counsel did not ask him to do anything to prepare for the trial and that the Petitioner was not prepared for the trial. He said that when counsel first began his representation, "everything seemed all right" and that counsel stopped talking to him, coming to see him, and providing him with information after learning the victim's mother worked for an attorney in town.

On cross-examination, the Petitioner testified that the forensic analysis he referred to previously was the competency evaluation. He agreed the evaluation report showed that he had higher-than-average intelligence and that an insanity defense was impossible. The report was received as an exhibit. He agreed that counsel filed motions to suppress and for a change of venue and that the trial court denied both motions. The motions were received as

exhibits. He agreed that counsel filed a motion for a new trial on April 8, 2009, although he denied being notified of the motion. The motion was received as an exhibit. He denied receiving a copy of this court's opinion affirming his convictions. He said that although his pro se petition for post-conviction relief mentioned this court's opinion, someone else prepared the petition. The trial transcript was received as an exhibit.

The Petitioner testified that counsel responded to half of his letters. When asked if counsel was absent for any "major" court hearings, he said he felt all of his court appearances were major. He did not recall which scheduled appearances counsel failed to attend. He agreed that counsel called his mother, who was called as a witness at the trial, and that the State called Brandon Browning as a witness. He said counsel did not ask Mr. Browning the questions the Petitioner wanted asked, although he could not recall the relevant questions.

The Petitioner testified that on the day of the shooting, he drove from Dyer to Jackson to pick up his gun and that he shot the victim, although he claimed the shooting was accidental. Regarding his intoxication, he agreed each police officer testified at the trial that he was not intoxicated, although he said, "What they said may not be true." He agreed Mr. Browning testified at the trial that the Petitioner "sounded normal" on the telephone. He denied he and the victim had reconciled, although the victim stayed overnight at his house the night before the shooting, and said he was dating Ms. Vandiver. He denied that the fight he and the victim had on the morning of the shooting was about his sending text messages to Ms. Vandiver. He said he "boot[ed]" Ms. Vandiver out of his house the night before the shooting in order for the victim to stay overnight with their son. The Petitioner said he wanted to spend a weekend with his son. He denied telling Ms. Vandiver that he wanted to reconcile with the victim and that the victim was moving into his house.

The Petitioner testified that the police did not perform a blood alcohol concentration test when he was questioned about the shooting. He agreed counsel asked each officer who testified at the trial whether he was intoxicated but said, "It's more to it than two questions." He could not state the questions that counsel should have asked the police officers. When asked how he would have presented evidence of intoxication without testifying at the trial, he said counsel could have presented evidence of his hospitalization for an overdose thirty days before the shooting. He said he had a known drug problem. When asked what questions he wanted counsel to ask his mother but did not ask, he said he did not recall.

The Petitioner testified that he knew he was not required to testify at the trial, although counsel did not explain it to him, and that he knew there were benefits and pitfalls in each decision. Although he denied choosing to testify, he agreed he "took the stand" based on counsel's advice that testifying was in the Petitioner's best interest.

The Petitioner testified that counsel should have questioned the medical examiner about whether the victim was shot once or twice. He denied shooting the victim twice. When asked what counsel should have asked the Tennessee Bureau of Investigation (TBI) ballistics expert, he said, "[T]here was only one shot fired." When the prosecutor stated that the expert testified that there were two spent shell casings and five live unfired shells, the Petitioner claimed the expert testified that he believed two shots were fired and that the second went through the floor. He said counsel could have asked the expert many additional questions, although he could not state what those questions were. He agreed he was not arguing that counsel should have presented more evidence about his and the victim's troubled relationship.

On redirect examination, the Petitioner testified that had counsel called the potential witnesses he provided counsel, evidence would have been presented about his and the victim's tumultuous relationship, the fight with the victim on the morning of the shooting, and the fight with the victim's brother the same day. He said witnesses would have rebutted the State's witnesses's testimony that he was sober on the day of the shooting. He said that he thought his aunt was living with his mother at the time and that counsel should have determined if she saw him intoxicated that morning. He said, though, counsel asked him to tell counsel what occurred from "Point A to Point B" and to give counsel a time line of the events that day.

The Petitioner testified that counsel did not ask about his cell phone records or use the records to "piece together" what occurred that day. He agreed his aunt and Ms. Vandiver would have testified if asked. He said the victim threatened to prevent his seeing his son after the victim went through his cell phone. He said that counsel's last witness at the trial was Drew Alford, the victim's brother, and that he was concerned about calling Mr. Alford as the last defense witness. He said the State should have called Mr. Alford. He said counsel never stated that he interviewed Mr. Alford before the trial or that Mr. Alford would corroborate the Petitioner's testimony.

Mary Vandiver testified that she had known the Petitioner for seven years, that she and the Petitioner were friends at the time of the shooting, and that they had been dating for about one week when the victim died. She said that around lunchtime on June 3, 2007, she talked to the Petitioner, who sounded "distorted." She said she had difficulty understanding the Petitioner but understood he was talking about his son. She said the Petitioner seemed confused, had slurred speech, and was upset. She said he was usually a cheerful person. She did not know where the Petitioner was when she talked to him. She said she could tell the Petitioner was upset with someone but was not sure whom, although she assumed it was the victim because he was talking about his son.

Ms. Vandiver testified that she had never seen the Petitioner intoxicated. She said the Petitioner might have had a drink with dinner but was cheerful, fun, and easy going. She said she was concerned about the Petitioner after talking to him on the telephone because he was upset and not "in a proper mind frame."

Ms. Vandiver testified that counsel contacted her before the trial, that she remained in contact with counsel and the Petitioner until the trial, and that she was available to testify at the trial. She said she met with counsel and the Petitioner's mother at counsel's office in August or September 2007. She said they discussed the Petitioner's character, the type of person he was, and if she talked to him on the day of the shooting. She said that counsel asked her to testify but that she did not speak to him again. She said she wrote a statement regarding the Petitioner's character and faxed it to counsel's office and left messages with counsel's secretary asking him to call her or the Petitioner's mother. She said she was present for the trial and would have testified if counsel had asked. She said that the Petitioner treated her and her daughter well and that she had never seen the Petitioner act the way he did on June 3, 2007.

On cross-examination, Ms. Vandiver testified that she recalled meeting with the TBI in 2008 but did not recall telling the agent that the Petitioner told her days before the shooting he was reconciling with the victim. She identified the statement she gave counsel and agreed that she wrote in the statement the Petitioner was considering reconciliation with the victim and that she did not mention the Petitioner's slurred speech. The statement was received as an exhibit.

On redirect examination, Ms. Vandiver testified that she wrote the statement at counsel's request and that she was not asked about the Petitioner's intoxication. She agreed she mentioned in her statement that the Petitioner lost custody of his son to the victim and was sad and worried about his son. She said the Petitioner lost custody within one month of the shooting. She agreed that she mentioned in the statement that the victim had threatened to prevent the Petitioner from seeing his son and to create problems with the Petitioner's probation officer. She agreed she was upset about the Petitioner's ending their relationship.

Joyce Herron, the Petitioner's mother, testified that she paid counsel $20,000 to represent the Petitioner in the murder and the child custody cases. She said she provided counsel her daily notes of specific events that occurred between the Petitioner and the victim since their son was born. She told counsel that on the morning of the shooting, the Petitioner called her, that he was disoriented, and that she knew he had been drinking. She said that she also saw the Petitioner around 9:00 or 10:00 that morning, that he was upset, that she could not get him to talk much, and that he left. She said she thought the Petitioner was intoxicated because she smelled whiskey in a cup from which he was drinking.

Ms. Herron testified that the Defendant was withdrawn when he stopped by her house that morning. She said the Defendant and the victim had fought for years. She said that the Petitioner and the victim lived across the street from her, that the Petitioner brought his son to her house before the victim left that morning, and that the Petitioner said she might not see the baby again. She said the victim chased after the Petitioner, attempting to prevent him from bringing his son to Ms. Herron. She said the Petitioner was crying and upset. She said that when the Petitioner returned around 9:00 or 10:00 a.m., he was "messed up."

Ms. Herron testified that she contacted counsel's office "hundreds of times" and that she called weekly and sometimes daily. She said counsel sometimes returned her calls. She said that when she and counsel spoke, she asked questions but did not get many answers. She said that she and the Petitioner waited a long time for paperwork and that counsel failed to show up for meetings with the Petitioner. She said that the Petitioner was unhappy with counsel's representation and that she heard the Petitioner complain about counsel within the first month of counsel's representation. She said counsel said it took "this County" forever to get things done before the trial.

Ms. Herron testified that she gave counsel the names of ten to fifteen potential witnesses, that everyone was willing to testify, and that counsel never contacted them. She said counsel discussed having the Petitioner evaluated and hiring an investigator, but she refinanced her house to pay attorney's fees and did not have funds for the additional expenses. She said that she testified at the trial and that counsel told her she would testify just before calling her as a witness. She denied counsel kept her informed of the court dates and prepared her for testifying at the trial. She recalled meeting with counsel in his office during which counsel read the definition of each charge against the Petitioner.

Ms. Herron testified that she thought counsel feared the victim's family and that she heard counsel state that he was afraid someone would shoot him for representing the Petitioner. She said she provided information regarding the victim and the Petitioner's relationship but was not aware of counsel's investigating further. She said counsel failed to ask her at the trial about the Petitioner's state of mind on the day of the shooting or about the Petitioner and the victim's relationship. She agreed, though, that counsel asked her at the trial if the Petitioner was drinking on the day of the shooting and to describe the Petitioner's demeanor. She agreed she testified that she was concerned about the Petitioner's leaving her house because she knew he had been drinking and had a "bad state of mind." She said she told counsel about the victim and the Petitioner's fighting, the Petitioner's attempting to make the relationship work, and the victim's wanting the Petitioner to stay home all the time. She said counsel did not ask her to review any of the State's evidence.

On cross-examination, Ms. Herron testified that counsel failed to present evidence of the Petitioner and the victim's domestic situation and of the Petitioner's intoxication but later admitted that she testified at the trial about both topics. She agreed testimony at the trial showed that the Petitioner was granted custody of his son through a temporary restraining order but said she was not present for all the trial testimony.

On redirect examination, Ms. Herron testified that she lived with her husband and sister at the time of the offenses and the trial. She denied that her sister, Lisa Pennington, and the Petitioner spoke on the morning of the shooting. She said she told counsel about her sister's being at the house when the Petitioner came to her house with his son on the morning of the shooting. She said that Ms. Pennington went with her to counsel's office a couple of times but that counsel did not ask her questions.

On recross-examination, Ms. Herron testified that she did not see the Petitioner consume pills on the day of the shooting, only alcohol. She agreed Ms. Pennington did not leave the house when the Petitioner brought his son to see her on the morning of the shooting. She agreed the Petitioner and Ms. Pennington had no interaction that day.

Lisa Pennington, the Petitioner's aunt, testified that counsel did not contact her about the Petitioner's case, although she went with Ms. Herron to counsel's office a couple of times. She said she saw the Petitioner on the morning of the shooting, although she did not talk to him. She said the Petitioner was upset and brought his son to see her and Ms. Herron. She said she told counsel about the Petitioner's demeanor when she went with Ms. Herron to counsel's office shortly after counsel was retained. She said she was never contacted by counsel or asked to testify, although she agreed to testify if she were asked. She said that had she testified, she would have told the jury that the Petitioner had been drinking that morning and was upset after arguing with the victim. She said the Petitioner wanted to bring his son to the Petitioner's mother because he did not want his son to witness the argument. She said that other than the Petitioner's being upset she could not recall the Defendant's demeanor.

On cross-examination, Ms. Pennington testified that the Petitioner was not intoxicated when he brought his son to Ms. Herron and that the Petitioner was drinking afterward, although she did not see the Petitioner after he took his son home. She said later, though, that she went outside when the Petitioner returned later that morning and that he was intoxicated. She agreed Ms. Herron was present.

Counsel testified that he began his representation of the Petitioner in June or July 2007 in the murder case and also represented the family in a Department of Children Services (DCS) matter. He stated that he investigated everything he thought was necessary and that Ms. Herron provided him with information he requested. He said Ms. Herron was the liaison

-12-

between him and the Petitioner. He agreed that he met with Ms. Herron numerous times and that Ms. Herron spoke to his paralegal more than him when she called his office. He said he provided answers to all her questions. He said he gathered information about the case as he could get it and filed his motion for discovery after the case moved to circuit court. He said that he and another attorney visited the Petitioner in jail when the case was in general sessions court and that the Petitioner was moved to the Madison County Jail after having "some trouble."

Counsel testified that he wrote the Petitioner a letter regarding the State's discovery package. He said the prosecutor's office required him to come to the office to handwrite the police narrative, which frustrated him because it delayed the discovery process. He told the Petitioner about the delay. He said that at one court appearance, he took the State's file to the jail and reviewed it with the Petitioner page-by-page. He said they reviewed everything the State had in its possession, including the police officers' statements, the ballistics report, and the autopsy report. He said he found a few things in the file that he had not previously received from the State.

Counsel testified that a question existed about the number of shots that were fired and that he was able to cross-examine the State's expert at the trial. He said he thought only one shot was fired, but the jury disagreed. He said his theory of the case was that only one shot was fired and that the Petitioner did not act with premeditation. He said the Petitioner went to Dyer where he and the victim argued. He said that when the Petitioner was there, a family member of the victim kicked open the door, causing the Petitioner to fire the gun instantaneously. He said that he conveyed this theory to the jury and that the Petitioner testified consistently with the theory.

Counsel testified that he and the Petitioner discussed his testifying before the trial. He said he asked the Petitioner to testify because he thought the jury needed to hear from the Petitioner. He did not think he could establish provocation, an accidental shooting, or intoxication without the Petitioner's testimony. He said, though, it was the Petitioner's decision and recalled the *Momon* hearing.

Counsel testified that he communicated with the Petitioner many times and that he met with the Petitioner about ten times. He agreed, though, that he probably missed a couple of meetings at the jail. He said that if he missed a meeting, a reason existed for his absence and that he made up for it at another meeting. He said he made a tactical decision not to call Ms. Vandiver as a witness because he thought he presented enough evidence for the jury to conclude that the Petitioner did not act with premeditation. He said that it was a difficult case because of the turbulent relationship between the Petitioner and the victim and because "the

grandmother . . . pushed the situation" until the worst happened and that he thought the jury understood the situation.

Counsel testified that evidence of the restraining orders and child custody matter was presented to the jury. He agreed Ms. Herron testified about the information provided in Ms. Pennington's post-conviction testimony, including the Petitioner's being upset and intoxicated and the child custody matter. Regarding an intoxication defense, he said he and the Petitioner discussed whether the evidence showed he was intoxicated. He said that although he thought the Petitioner was probably intoxicated, he "couldn't get it to the jury like he wanted." He said that he cross-examined each police officer who had contact with the Petitioner shortly after the shooting and that none of the officers provided evidence that the Petitioner was intoxicated. He said it was as though the officers were prepared for his asking about whether the Petitioner was intoxicated. He said that the Petitioner's intoxication was raised at the hearing on the motion to suppress his police statement and that a transcript of the questions was presented at the hearing and at the trial. He said he attempted to present the audio or video recording of the interview, but the trial judge denied his request.

Counsel testified that he received a copy of the ballistics report "late in the game" but had it before the trial. He said that before the trial, he spoke with Brandon Browning, who wanted to help the Petitioner. He said he questioned Mr. Browning during cross-examination at the trial but noted that Mr. Browning "kept some guns" for the Petitioner because the Petitioner was a convicted felon. He recalled the Petitioner obtained the gun used in the shooting from Mr. Browning. He said that it was a "double-edged sword" and that he made a strategic decision not to call him as a defense witness. He said that he could not recall if he asked Mr. Browning if the Petitioner sounded intoxicated on the telephone but that if he did ask, Mr. Browning did not provide the answer he wanted.

Counsel testified that the situation between the Petitioner's and the victim's families was "as hostile as it gets." He said that the Petitioner and Drew Alford argued on the day of the shooting and that Mr. Alford threatened to shoot the Petitioner if he came to Dyer. He said the victim's family members would not cooperate with his investigation, which prevented his interviewing them before the trial. He said he made a tactical decision to call Mr. Alford as a witness because he hoped Mr. Alford's hostility toward the Petitioner would come out during his trial testimony. He agreed he met with the Petitioner about ten days to two weeks before the trial to prepare the Petitioner.

Counsel testified that the Petitioner presented him with a list of character witnesses whom the Petitioner wanted called at the trial. He said that the witnesses were discussed at a pretrial hearing and that the prosecutor told counsel that if he presented favorable character witnesses, the State would ask about the Petitioner's previous felony convictions. He

-14-

concluded that character witnesses were not relevant and did not need to be presented. He agreed the Petitioner had previous felony convictions for assault, a drug-related offense, and escape and had misdemeanor convictions for assault, drugs, and underage consumption. He said character witnesses would have been asked about these convictions, which was not a good trial strategy.

Counsel testified that the Petitioner underwent a mental health evaluation before the trial and that he decided not to present an insanity defense. He said he did not think an independent investigator was necessary in this case. He said that he was familiar with the facts and that the child custody case was pending at the same time. He disagreed with the Petitioner's assertion that he failed to question witnesses and said the trial transcript reflected his questioning the witnesses. He agreed, though, that he did not make a closing argument and said it was his general practice in criminal cases. He could not recall the Petitioner's wanting him to ask specific questions of individual witnesses. He agreed he presented evidence of intoxication and the domestic relationship through Ms. Herron.

Counsel testified that he did not have any type of relationship with the victim's mother and that he was not afraid of the victim's family. He said he represented the Petitioner to the best of his ability. He said he knew the victim's mother worked for an attorney and had used the attorney's letterhead to sabotage the Petitioner's relationship with his son. He said sufficient evidence was presented about the Petitioner and the victim's turbulent relationship and that he did not see a reason to present further evidence. He said the jury understood the "dynamic."

Counsel testified that he represented the Petitioner through the appellate process and that he instructed his staff to forward the trial transcript to the Petitioner. He did not know why the Petitioner did not receive them. He agreed he filed a motion for a change of venue. He said that although the trial court denied the motion, the court excused more than twenty-five prospective jurors for cause and that the Petitioner received a fair trial.

On cross-examination, counsel testified that he did not dispute failing to appear for four meetings with the Petitioner. He said, though, that he made up for any missed appointments by going to see the Petitioner. He said that it was not his practice not to appear for a meeting and not to send notification about his absence and that he should have sent the Petitioner a note informing him of his absence. He said he communicated with the Petitioner about the facts and the case generally throughout his representation. He denied knowing the dates on which he spoke to the Petitioner and said he did not keep a log. He noted the jail logged his visits with the Petitioner. He did not keep a log of his time in the Petitioner's case but maintained records of his investigation. He said he spoke with the Petitioner's mother and obtained relevant information from her. He said he spoke to Ms. Vandiver more than once.

He said he considered calling Ms. Vandiver as a witness but concluded that they were "where they needed to be" without her testimony. He talked to Ms. Pennington once when she came to his office. He agreed he did not call her as a witness but said he investigated her statements that she saw the Petitioner that morning and that he was intoxicated.

Counsel testified that he presented the Petitioner and his mother at the trial to refute the police officers' testimony that the Petitioner was not intoxicated on the morning of the shooting. He agreed any testimony from them would have been self-serving and said he probably should have called Ms. Vandiver and Ms. Pennington. He said he talked to the victim's brother before the trial who "indicated there were problems." He denied that before the trial, the victim's brother admitted threatening the Petitioner but said that he thought the victim's brother might admit to it at the trial and show his hostility. He said that although the victim's brother was not present at the shooting, the victim's brother was present for many of the events leading up to the shooting and was in the best position to show the hostility between the victim's family and the Petitioner.

Counsel testified that he investigated and talked to each witness on the indictment. He said he attempted to find a video or audio recording of the police interview. He said he attempted to find other evidence of the Petitioner's intoxication because he knew it probably would have reduced the Petitioner's sentence by twenty-five years. He agreed the Petitioner and his mother provided a list of potential witnesses but denied calling Ms. Jenkins and could not recall if he talked to Mr. Chumney.

Counsel testified that he knew the Petitioner's state of mind from his representing the Petitioner in the custody case and the Petitioner's mother's statements. He said, though, he made a judgment call not to request a second mental health evaluation. He said an investigator was unnecessary because the facts of the case "were right there in front." He said he began preparing for the trial on the day he read the warrant. He said he attempted unsuccessfully to negotiate a plea agreement. He said he thought the jury would consider manslaughter during its deliberations based on the fact that the Petitioner was startled by one of the victim's family members and that the gun went of instantaneously. He said he thought the Petitioner was the best witness to show the shooting was accidental because he was present during the shooting. He said that he and the Petitioner discussed his testifying and that he told the Petitioner the prosecutor would "pick on him" because of his previous convictions and the facts of the case.

Counsel testified that he probably did not respond to each of the Petitioner's letters but that he had "a lot of contact" with the McIllwain family. He said later, though, that he responded to all the Petitioner's letters and that the Petitioner received "all of his information." He said he dropped off a letter at the jail many times on his way home. He

-16-

agreed that he filed the notice of appeal on April 13, 2009, and said that he communicated with the Petitioner about the appeal. He agreed he filed a motion requesting an extension of time to file the appellate brief because of his busy schedule.

Counsel testified that he did not attempt to mislead the Petitioner about the delay in obtaining the discovery material. He said he decided not to pursue an insanity defense because he did not think it would be successful based on the mental health evaluation. He did not recall the Petitioner's requesting a second evaluation. He said he thought he kept the Petitioner informed throughout his representation. He did not recall telling the Petitioner at the trial when the ballistics report was received as an exhibit that counsel thought only one shot was fired. He said it was impossible that he did not know the State was going to present evidence of two gunshots.

Counsel testified that he spent about thirty hours preparing for the trial in the three months before the trial. He could not recall the length of time he and the Petitioner discussed the issues that would arise. He said he received the photographs presented at the trial and shared those with the Petitioner as part of the discovery package. He said he took the State's file to the jail and reviewed it with the Petitioner "well before the trial." He denied telling the Petitioner he was afraid of the victim's family.

Counsel testified that the State attempted to present an audio recorded telephone conversation between the Petitioner and Ms. Herron during which the Petitioner said he was remorseful for his actions and wished he had killed the "whole MFing family." After reviewing the trial transcript, counsel said he objected to the State's presenting the evidence during Ms. Herron's testimony, although he did not make a specific objection to the recording's admission.

On redirect examination, counsel testified that when he said he was required to write the narratives, he was referring to the police reports. He said the State ultimately provided copies of the reports, although he could not recall when. He said that although he did not talk to each potential witness provided by the Petitioner and his mother, Ms. Herron provided summaries of what she thought the witnesses would say if they testified.

On recross-examination, counsel testified that he did not recall if the Petitioner's previous convictions were more than ten years old. He said that his focus was on whether the case was first degree murder. He said that he did everything he could to show the jury that the Petitioner was intoxicated, that he did not act with premeditation, and that the victim's family member triggered the Petitioner's firing the gun.

-17-

The trial court denied post-conviction relief. The court stated that the evidence against the Petitioner was overwhelmingly strong. It noted that there were a number of "problematic aspects" to counsel's representation but that counsel adequately represented the Petitioner. Regarding the missed appointments with the Petitioner, the court found that counsel's missing the appointments did not affect the defense or the outcome of the case. The court found that no evidence existed beyond mere accusation that a personal relationship existed between counsel and the victim's family or that any relationship affected counsel's ability to provide a vigorous defense.

Regarding counsel's failure to present additional witnesses to show the Petitioner's intoxication, the trial court found that an argument existed that any additional testimony would have been cumulative and "subject to the same argument about being too close" to the Petitioner. The court noted that although counsel might have called additional witnesses, he made a tactical decision that would not have affected the outcome of the trial. The court noted that the Petitioner was entitled to fair, adequate, and effective representation, not a perfect defense. The court found that counsel provided the effective assistance of counsel. This appeal followed.

As a preliminary matter, the State argues in its brief that the appeal should be dismissed because the Petitioner failed to file a timely notice of appeal and failed to request a waiver of the notice. *See* T.R.A.P. 4. The Petitioner's brief does not address the timeliness of the notice of appeal.

The record shows that the trial court's order denying post-conviction relief was entered on March 19, 2013, and that an amended order was entered on September 24, 2013. The amended order made no additional factual findings but stated that appellate post-conviction counsel "is appointed" to represent the Petitioner and that appellate post-conviction counsel "was not given notice of the original Order until September 10, 2013 and therefore was not able to timely file an Appeal" on the Petitioner's behalf. The amended order stated that appellate post-conviction counsel "be given Notice to the proceedings in this matter to adequately prepare an appeal" on the Petitioner's behalf. The Petitioner's notice of appeal was entered on October 7, 2013. At oral argument, post-conviction appellate counsel explained that he did not know he was appointed until September 2013, and that the trial court amended the order to permit him time to file a notice of appeal. He requested this court waive the timely filing of the notice of appeal in the interest of justice.

The record indicates that the trial court amended its order to allow appellate counsel time to file a timely notice of appeal because counsel was unaware he was appointed to the Petitioner's case. The record shows, though, that the trial court lost jurisdiction on April 19, 2013, thirty days after the original order was entered. The trial court lacked the authority to

amend the order. Thus, the notice of appeal was untimely. The notice of appeal, though, "is not jurisdictional and the filing . . . may be waived in the interest of justice." T.R.A.P. 4(a). Because of the unique circumstances surrounding counsel's appointment, we waive the timely filing of the notice of appeal and consider the Petitioner's contention that he received the ineffective assistance of counsel in the interest of justice.

The Petitioner contends that he received the ineffective assistance of counsel. He argues that counsel was ineffective in the pretrial and investigation stage of his case, during the trial, during sentencing, and on appeal. We note first that at the post-conviction hearing, no evidence was presented regarding counsel's performance during sentencing or on appeal.

Regarding the Petitioner's arguments related to the pretrial and trial stages of counsel's representation, the Petitioner provides a lengthy numerical list of grievances regarding counsel's representation. The Petitioner, however, fails to explain how each grievance resulted in deficient performance and prejudice, fails to cite to the record, and fails to cite to legal authority. At oral argument, this court inquired about the inadequate nature of the Petitioner's brief, and post-conviction appellate counsel conceded the brief failed to comply with Tennessee Rule of Appellate Procedure 27. *See* T.R.A.P. 27(a)(6), (a)(7)(A), (B); *see also* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Post-conviction appellate counsel noted the lengthy list of grievances contained in the brief and stated that the most viable argument surrounded counsel's failure to present a strong intoxication defense. Unlike the other assertions contained in the appellate brief, counsel provided an argument supported by legal authority for this court to consider the merits of the argument. Counsel, however, did not cite to the record in support of his argument. *See* T.R.A.P. 27; Tenn. Ct. Crim. App. R. 10. We will consider whether counsel provided ineffective assistance relative to the Petitioner's intoxication, but because the Petitioner's brief significantly fails to comply with the rules governing the content of appellate briefs, the remaining assertions are waived.

Regarding the Petitioner's intoxication at the time of the shooting, he argues that counsel provided ineffective assistance by failing to present evidence that his intoxication prevented him from killing the victim with premeditation and by failing to request the appropriate jury instructions. At oral argument, though, counsel conceded that evidence of his intoxication was presented to the jury. Although not explained in his brief, we presume the Petitioner asserts that counsel should have presented Ms. Vandiver and Ms. Pennington, witnesses who testified at the post-conviction hearing regarding the Petitioner's intoxication, as witnesses at the trial because they could have provided additional testimony regarding the Petitioner's intoxication. The State responds that counsel was not deficient because evidence of intoxication was presented at the trial, that the additional evidence of intoxication from Ms.

-19-

Vandiver and Ms. Pennington did not bolster the Petitioner's position that he was intoxicated at the time of the shooting, and that additional evidence of his intoxication does not refute the significant amount of proof establishing premeditation.

The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. *Id.* at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2012).

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the Petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance fell below a reasonable standard is not enough because the petitioner must also show that but for the substandard performance, there is "a reasonable probability that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the *Strickland* test. *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability means a "probability sufficient to undermine confidence in the outcome." *Id.*

The record shows that at the post-conviction hearing, Ms. Vandiver testified that she received a telephone call from the Petitioner on the morning of the shooting, that she had difficulty understanding him, and that she understood the Petitioner was talking about his son. Although she had never seen the Petitioner intoxicated, she said the Petitioner seemed confused, had slurred speech, and was upset. She said she could tell the Petitioner was upset with someone but was not sure with whom, although she assumed it was the victim because

the Petitioner was talking about his son. She was concerned about the Petitioner because he was not "in a proper mind frame." Ms. Vandiver admitted that counsel contacted her before the trial and that she remained in contact with counsel and the Petitioner until the trial.

Ms. Pennington testified at the post-conviction hearing that she saw that the Petitioner was upset on the morning of the shooting but could not recall his demeanor and that she heard the Petitioner tell his mother, Ms. Herron, that he and the victim were fighting. She said she saw the Petitioner drinking alcohol that morning. At the post-conviction hearing, Ms. Herron testified that she told counsel about Ms. Pennington's being at the house when the Petitioner came to her house on the morning of the shooting.

Although Ms. Pennington saw the Petitioner drinking alcohol on the morning of the shooting and Ms. Vandiver thought the Petitioner was confused, had slurred speech, was upset, and was not in the proper frame of mind, neither Ms. Vandiver nor Ms. Pennington testified to facts supporting a conclusion that the Petitioner was so intoxicated that he was incapable of premeditation at the time of the shooting. Evidence of the Petitioner's intoxication was presented to the jury at the trial through the Petitioner and Ms. Herron's testimony. Although Ms. Pennington and Ms. Vandiver would have supported the Petitioner's contention that he was intoxicated the morning of the shooting, the testimony would not have presented the jury with any new information. The record shows that at the trial Ms. Herron testified about the Petitioner's intoxication on the morning of the shooting and said that the Petitioner had been drinking alcohol and that the Petitioner admitted to taking pills before the shooting. At the post-conviction hearing, Ms. Herron agreed that counsel asked her at the trial if the Petitioner was drinking on the day of the shooting and to describe the Petitioner's demeanor. She, likewise, agreed she testified at the trial that she was concerned about the Petitioner's leaving her house because she knew he had been drinking and had a "bad state of mind." The Petitioner testified at the trial that he was intoxicated at the time of the shooting, that he did not intend to kill the victim, and that the shooting was accidental.

We note the overwhelming evidence of premeditation presented at the trial. After the Petitioner and the victim fought, the victim went to her father's house in Dyer, Tennessee, miles from the Petitioner's house in Jackson. The Petitioner called Mr. Browning asking for one of the Petitioner's guns. The evidence shows that Ms. Browning kept the Petitioner's guns at his house because the Petitioner was a convicted felon. We note that Mr. Browning testified that the Petitioner "sounded normal" that morning on the telephone. The Petitioner drove to Mr. Browning's house, obtained the gun used during the shooting, and drove to victim's father's house. The victim's aunt, returning home from church, heard a loud noise from inside her house, opened the door, and saw the Petitioner pointing a gun at her. The record shows that the Defendant turned and shot the victim, who was sitting on the floor

against a sofa. Officer Ryan Shanklin testified that the Defendant stated, "I know I f----- up" and "You don't know what she's put me through with my kids."

Counsel testified that he and the Petitioner discussed whether the evidence showed he was intoxicated. He said, and the record confirms, that he cross-examined each police officer who had contact with the Petitioner after the shooting. None of the officers provided testimony at the trial that the Petitioner was intoxicated at the time of the shooting. Regarding Ms. Vandiver, counsel said that he spoke to her more than once before the trial and that he considered calling her as witness but concluded that sufficient evidence of intoxication was presented to the jury without her testimony. Likewise, counsel spoke to Ms. Pennington before the trial when she came with Ms. Herron to her office. He investigated her statements regarding the Petitioner's intoxication but decided not to call her as witness because Ms. Herron provided the same information during her trial testimony. Although counsel agreed he probably should have called Ms. Vandiver and Ms. Pennington because the Petitioner and his mother's testimony was self-serving, the evidence shows that the Petitioner had been in a romantic relationship with Ms. Vandiver and that Ms. Pennington was the Petitioner's aunt.

We conclude that the evidence does not preponderate against the trial court's findings and that the trial court did not err by denying post-conviction relief. The Petitioner has failed to show that a reasonable probability exists that the result of the trial would have been different had counsel presented additional evidence of the Petitioner's intoxication. He is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE